## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

RANDALL B. STAR,                         :

      Plaintiff,                    :
                                      Case No. 3:12cv00017

  vs.                                  :

                                    District Judge Thomas M. Rose

CAROLYN W. COLVIN,                       :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                 :

      Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Randall B. Star brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). Plaintiff protectively filed[2] his SSI and DIB applications on May 3, 2007, asserting that he has been under a "disability" since March 22, 2004. (*PageID##* 189-91, 192-97). Plaintiff claims to be disabled due to severe

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits. It may be used to establish an earlier application date than when the Social Security Administration received the claimant's signed application. *See* http://www.ssa.gov/glossary.

1

coronary artery disease, depression, headaches, cholesterol, high blood pressure, and restless leg syndrome.  (*See PageID#* 234).

After various administrative proceedings, Administrative Law Judge (ALJ) Janice M. Bruning denied Plaintiff's applications based on her conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (*PageID##* 53-61).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  This Court has jurisdiction to review the administrative denial of her applications.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #11), the Commissioner's Memorandum in Opposition (Doc. #13), the administrative record (Doc. # 10), and the record as a whole.

## II.  Background

### A.    Plaintiff's Vocational Profile and Testimony

Plaintiff was 43 years old on his alleged disability onset date, which defined him as a "younger individual" for purposes of resolving his DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[3]; (*PageID##* 60, 229).  Plaintiff has a high school education, with attendance in special education classes.  *See* 20 C.F.R. § 404.1564(b)(4);

---

[3] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

(*PageID#* 240).  He has past relevant employment as a janitor and press operator. (*PageID#* 235).

Plaintiff testified that he suffers from lower back pain (which he rated as a 6 out of 10) and has chest pain about once every other day (which he rated as a 7 out of 10). (*PageID##* 76, 83).  Nitroglycerine helps Plaintiff with his chest pain, but he also has to sit down for about 5 minutes.  (*Id.*).  Plaintiff reported shortness of breath with any walking.  (*PageID#* 77).

At the time of the hearing, Plaintiff described difficulties with concentrating, focusing, and memory loss.  (*PageID#* 77).  He has not been hospitalized due to any psychiatric issues .  (*Id.*).

Plaintiff estimated that he can walk 50 feet before becoming short of breath and before his legs start hurting.  (*Id.*).  He can stand for 5 minutes, and sit for about 10 minutes at a time.  (*PageID#* 78).  He believed that he could lift 5 pounds.  (*Id.*).  He acknowledged difficulty climbing stairs, bending, stooping, crouching, crawling, and kneeling.  (*Id.*).  He also reported that he gets short of breath and has back pain with reaching.  (*Id.*).

He uses a continuous positive airway pressure (CPAP) machine to help him with his breathing when he sleeps.  (*PageID#* 79).  He acknowledged taking a 30 minute nap during the day.  (*Id.*).  He can dress himself, but it takes "a while."  (*Id.*).  He no longer drives because, as he stated, "I can't hardly do it anymore."  (*PageID##* 79-80, 85).

Plaintiff testified that he lives with his sister and she does all of the cooking (except he can prepare microwaveable meals). (*PageID##* 75, 80).  His sister also does the dishes and laundry.  (*Id.*).  His brother-in-law does all the yard work.  (*PageID#* 81). He reported going to baseball games about once a week, but had difficulty climbing the bleachers.  (*Id.*).  He watches sports and news on television, reads the newspaper, and does puzzles.  (*PageID#* 81-82).  He used to play electronic games but he gave them to his nephew.  (*PageID#* 82).

### B.    <u>Medical Opinions</u>

Plaintiff relies on the opinions of treating cardiologist, Cass Cullis, M.D.  Plaintiff began treating with Dr. Cullis on June 19, 1998.  (*PageID#* 798).

Due to recurrent unstable anginal symptoms, Plaintiff underwent a left heart catheterization and coronary arteriogram at Upper Valley Medical Center in October 2003.  (*PageID##* 657, 467-72).  The final diagnoses revealed atherosclerotic heart disease with severe obstructive coronary artery disease resulting in an ejection fraction of 32% in the left ventricle.  (*PageID##* 467-68).

When Plaintiff was seen by Dr. Cullis on February 3, 2005, he reported increased angina and shortness of breath with mild activity.  (*PageID#* 534).  Dr. Cullis noted an EKG showed a right bundle branch block, and ordered additional testing.  (*Id.*). Stress testing performed on February 11, 2005 revealed a moderate sized apical anterior and lateral fixed defect.  (*PageID##* 501, 649-50).

On August 11, 2005, Plaintiff complained of increased angina occurring almost every other day.  (*PageID#* 529).  His most recent stress test showed a moderate apical anterior and fixed lateral defect consistent with infarction.  A cardiac catheterization was recommended due to persistent symptoms.  (*Id.*).  The cardiac catheterization was performed on August 16, 2005, and demonstrated severe obstructive coronary artery disease involving the proximal right coronary artery and the diagonal branch of the anterior descending artery.  Plaintiff also had evidence of severe left ventricular systolic dysfunction with mildly increased end-diastolic volume an ejection fraction of 33%.  There was akinesia of the anterior apical two-thirds of the left ventricle.  (*PageID##* 410-12).

On August 24, 2005, Plaintiff underwent percutaneous transluminal coronary angioplasty (PTCA) and stent of the right coronary artery.  (*PageID##* 501-07).  Dr. Cullis noted that prior to the procedure, Plaintiff had an 88% obstruction which was reduced to 0% due to the surgery.  (*PageID#* 507).

In a follow-up visit on September 12, 2005, Plaintiff reported some continued angina symptoms and one episode of diaphoresis and dizziness, however, he was significantly improved and was only using nitroglycerin occasionally.  (*PageID#* 527).  Dr. Cullis thought Plaintiff was "doing well" and there was no evidence of congestive heart failure.  (*Id.*).  Plaintiff was instructed to continue his medications (aspirin, Plavix, Zocor, and Inderal) and he was restricted from lifting over 40 pounds or doing strenuous activity, but he was told that he could nonetheless remain active.  (*Id.*).

When seen by Dr. Cullis on November 10, 2005, Plaintiff reported that he had increased chest pain occurring about once a day and exertional dyspnea.  (*PageID##* 525-26).  Dr. Cullis noted that Plaintiff had a regular heart with no ectopy, murmurs, or gallops, and clear lungs.  (*Id.*).  Dr. Cullis believed that Plaintiff's symptoms were likely due to small vessel disease with underlying depression contributing to his symptoms. (*Id.*).  Dr. Cullis noted the following: "encouraged him to be more active and to try to walk regularly and get some exercise.  I have restricted him to not lifting over 40 pounds at a time or doing strenuous activity.  Overall, even though he is symptomatic, I think that he is stable." (*Id.*).  Lasix was prescribed.  (*Id.*).  On February 7, 2006, Plaintiff complained of experiencing chest discomfort every other day.  (*PageID#* 522).  Dr. Cullis ordered a stress test and indicated that "a lot of his symptoms seem to stem from depression." (*Id.*).  A stress test performed on February 6, 2006 showed some abnormalities, which "indicate[d] an intermediate risk for hard cardiac events." (*PageID##* 510-11).

In August 2006, Dr. Cullis found that while Plaintiff experienced some shortness of breath on exertion, chest discomfort was only occasional.  In addition, examination showed normal carotid pulses, regular heartbeat, and only mildly diminished breath sounds.  (*PageID#* 516).

At the request of the Ohio Bureau of Disability Determination (BDD), Dr. Cullis prepared a narrative on August 8, 2007, summarizing his treatment and findings.  Dr. Cullis cited a history of cardiac catheterization and angioplasty, as well as chest x-rays

6

and EKGs to support the opinion.  Left ventricular ejection fractions ranged from 33% in August 2005 to 40% in February 2006 (after undergoing PICA and stenting of the right coronary artery).  Dr. Cullis further reported that when Plaintiff was examined on May 3, 2007, he complained of intermittent chest discomfort, some occasional lightheadedness, and shortness of breath.  Examination showed no evidence of congestive heart failure, and a regular heart rhythm.  Dr. Cullis concluded that Plaintiff "probably could do sedentary work, but I think that he would be limited in doing moderate work." (*PageID##* 617-18).

Plaintiff presented to the emergency room on September 12, 2007, complaining of chest pain radiating to his left arm and gastrointestinal bleeding.  (*PageID##* 691-729). He was started on intravenous medications, and diagnosed with left sided chest pain with known coronary artery disease.  (*PageID#* 692).  An echocardiogram dated September 13, 2007 showed mild left ventricular dilation and moderately depressed ejection fraction estimated at 30-35%.  (*PageID##* 694-95).  Plaintiff was seen by Dr. Cullis for a follow-up visit on September 28, 2007.  (*PageID#* 750).  Plaintiff denied any lightheadedness or dizziness, except occasionally if he takes too many deep breaths.  He denied any increase in shortness of breath from baseline.  Plaintiff reported he does occasionally have chest pain, lasting 5 to 10 minutes in duration.  The pain was not radiating, nor was it associated with nausea, vomiting, or sweating.  Occasionally, he felt his heart racing, which makes him feel tired.  (*Id.*).  On October 15, 2007, Plaintiff's

symptoms had not changed and he was advised to increase his dose of Mononitrate. (*PageID##* 748-49).

On December 26, 2007, Dr. Cullis completed a questionnaire on behalf of the Ohio BDD.  (*PageID##* 797-99).  He listed Plaintiff's diagnoses as artherosclerotic heart disease class IV, exertional dyspnea, hyperlipidemia, and hypertension.  (*PageID#* 798). Plaintiff's symptoms were left parasternal pain with radiation, dyspnea, and frequent coughing and wheezing.  (*Id.*).  Dr. Cullis also cited to EKG findings.  (*Id.*).  He listed Plaintiff's medications, noted he did not have a heart murmur, and noted he had normal pulses.  Dr. Cullis did not respond to the questions inquiring about Plaintiff's compliance, nor did he describe any functional limitations.  (*PageID#* 799).

On May 29, 2008, Plaintiff reported chest heaviness, and shortness of breath that was essentially unchanged.  (*PageID##* 832-33).  Dr. Cullis noted Plaintiff's symptoms sounded stable and he did not make any changes to Plaintiff's medication.  (*Id.*).  An EKG showed right bundle branch block and prior apical infarction.  (*PageID#* 838). A stress test performed on June 3, 2008 revealed findings consistent with 2 vessel disease, abnormal left ventricle global functioning, and volume with abnormal wall motion. (*PageID##* 836-37).

On June 11, 2009, Plaintiff complained of ongoing chest pain and significant dyspnea.  Dr. Cullis opined that Plaintiff was totally disabled based on his persistent symptoms.  (*PageID##* 863-64).

8

Dr. Cullis completed a Cardiac Residual Functional Capacity Questionnaire on June 12, 2009. (*PageID##* 839-42). He reported that he saw Plaintiff about every six months and that Plaintiff was a New York Heart Association Function Class 3 patient with fair prognosis. (*PageID#* 839). Plaintiff's diagnoses included severe artherosclerotic heart disease, old anterior apical heart attack, hypertensive cardiovascular disease, and depression. Dr. Cullis identified Plaintiff's symptoms as chest pain, shortness of breath, and light headedness. Dr. Cullis noted that Plaintiff also had depression, anxiety, and a fear of dying. (*Id.*). Dr. Cullis opined that Plaintiff was incapable of even low stress jobs due to his shortness of breath, limited exercise tolerance, and difficulty with minimal exertional activity. (*PageID#* 840). Dr. Cullis affirmed that Plaintiff's emotional factors contributed to his subjective symptoms and functional limitations. (*Id.*). Dr. Cullis opined that Plaintiff could not lift any weight, that he could stand and/or walk less than two hours in an eight hour workday, and sit about two hours in an eight hour workday. (*PageID#* 841). Dr. Cullis also thought that Plaintiff would have to shift positions at will, would need to frequently take 10-15 minute unscheduled breaks, and would miss more than four days per month from work. (*PageID#* 841-42). Dr. Cullis believed these limitations began in August 2006. (*PageID#* 842). Dr. Cullis concluded that Plaintiff's "depression, anxiety and worry about his health causes significant psychological impairment." (*Id.*).

On August 25, 2009, Plaintiff reported that he was not very active, but when he tried to do anything he had recurrent chest pains. (*PageID#* 862). An updated scan was

9

ordered.  (*Id.*).  Stress testing performed on September 1, 2009, revealed an extensive anterior, apical, distal anteroseptal and distal anterolateral defect that was minimally reversible in the left ventricle; findings consistent with 2 or 3 vessel disease; an ejection fraction of 36%; evidence suggesting marked enlargement; and abnormal left ventricle wall motion.  (*PageID*## 865-66).  Dr. Cullis noted Plaintiff's stress was judged to be good, he had a normal blood pressure response, and chest pain did not occur.  (*PageID#* 866).  Dr. Cullis noted Plaintiff had "an intermediate risk for hard cardiac events."  (*Id.*).

The record also contains the opinions of several non-treating medical professionals.  On June 26, 2007, Plaintiff was evaluated by clinical psychologist, Michael Wuebker, Ph.D., at the request of the Ohio BDD.  (*PageID*## 585-91).  Plaintiff reported that this was the third time he was applying for disability benefits.  He was last employed in 2004 and he asserted that he related adequately to co-workers and supervisors.  (PageID# 586).

On mental status examination, Plaintiff was pleasant and cooperative; he had logical and goal directed speech; a somewhat depressed mood and blunted affect; and no clinical evidence of hallucination or thought disorder.  Plaintiff reported feelings of hopelessness, helplessness, irritability, isolative behavior, decreased concentration, decreased energy, and anhedonia.  (*PageID#* 585-88).

IQ testing revealed a performance IQ of 78, a verbal IQ of 72, and a full scale IQ of 73.  (*PageID#* 588).  WMS-III testing was consistent with an extremely low immediate

memory and borderline general memory. (*PageID#* 589). Dr. Wuebker diagnosed major depression, recurrent, moderate, and borderline intellectual functioning. He assigned Plaintiff a Global Assessment of Functioning (GAF) score of 53. (*PageID#* 590).

Dr. Wuebeker opined that Plaintiff's ability to relate to others, including fellow workers and supervisors, was unimpaired; his ability to understand, remember, and follow simple instructions in the work environment was mildly impaired; and his ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks in a work setting was moderately impaired. (*PageID#* 590). Dr. Wuebker concluded that Plaintiff's ability to withstand the stress and pressures associated with day-to-day simple work activity was moderately impaired. (*Id.*).

On July 6, 2007, after review of Plaintiff's medical record, Mel Zwissler, Ph.D. (a state agency psychologist) assessed Plaintiff's mental condition. (*PageID##* 594-611). Dr. Zwissler opined that Plaintiff had a mild restriction of activities of daily living; no limitations in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (*PageID#* 604). Dr. Zwissler concluded that his assessment is an adoption of the ALJ decision dated April 26, 2007, which was being adopted under AR 98-4 (*Drummond* Ruling). (*PageID#* 610).

Amita Oza, M.D., consultatively examined Plaintiff at the request of the Ohio BDD on July 23, 2007. (*PageID##* 577-83). Plaintiff reported a history of hypertension; a heart attack status-post angioplasty and stent placement; anxiety with depression; and

11

sleep apnea.  He complained of anginal pain, and lower back pain (which has been diagnosed as arthritis).  (*PageID#* 581).  Dr. Oza found Plaintiff's heart rate and rhythm to be regular; his heart sounds were distant with no obvious murmurs, gallops, or rubs. (*PageID#* 582).  Plaintiff had full muscle strength throughout his body with no muscle spasm or atrophy.  (*PageID##* 577-78, 583).  He exhibited low back pain with straight leg raising, painful range of motion in the hips at extremes, and mildly decreased motion in the lumbosacral spine.  There was no neurosensory deficits noted and no tenderness on palpation of dorsolumbar spine.  Gait was normal without ambulatory aids.  (*PageID#* 583).  Dr. Oza concluded that Plaintiff's "work related activities would be mainly affected by his cardiac problems."  (*Id.*).

Paul Morton, M.D., reviewed the file on August 16, 2007.  (*PageID#* 660-67).  Dr. Morton concluded that Plaintiff could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for no more than four hours in an eight hour workday; and sit about six hours in an eight hour workday.  (*PageID#*  661).  Plaintiff could never climb ladders, ropes, or scaffolds; and could only occasionally climb ramps/stairs, stoop, and crouch.  (*PageID#* 662).  Plaintiff was also to avoid all exposure to hazards, such as machinery, heights, etc.  (*PageID#* 664).  Dr. Morton also noted that the above residual functional capacity is an adoption of the ALJ decision from April 26, 2007, which was being adopted under AR 98-4 (*Drummon*d Ruling).  (*PageID#* 667).

C.    **Vocational Expert Testimony**

In addition to Plaintiff, a vocational expert (VE) testified at the administrative hearing.  The VE classified Plaintiff's past work as a press operator and janitor, and as medium and unskilled.  (*PageID##* 86-87).

The VE was asked to consider an individual with the same age, education, and work experience as Plaintiff, who can lift and carry 10 pounds occasionally and 10 pounds frequently; stand and/or walk a total of two hours during an eight hour day; and sit at least six hours during an eight hour work day.  Such an individual should never climb any ropes or scaffolding; can occasionally climb ramps and stairs; can occasionally balance, stoop, crouch, kneel, and crawl.  Such an individual should avoid concentrated exposure to work hazards (such as using and moving machinery), as well as avoid concentrated exposure to lung irritants.  Such an individual is limited to simple, unskilled, repetitive work with no more than 3-step tasks.  (*PageID#* 87).  With those restrictions, the VE testified that Plaintiff could not perform his past work.  (*Id.*).

The VE also testified that Plaintiff could perform the requirements of unskilled, sedentary occupations such as an information clerk (with 400 jobs in the regional area and 444,000 job in the State of Ohio), charge account clerk (with 300 regional jobs and 6,500 in the state), and order clerk (with 900 regional jobs and 15,000 jobs in the state). (*PageID##* 87-88).

The VE testified that an individual who is off task more than 10 to 12 percent of the workday could not maintain unskilled work.  (*PageID#* 89).

13

When cross-examined by Plaintiff's counsel, the VE testified that an individual who needs unscheduled breaks beyond the customary breaks allowed in the morning and afternoon (and for lunch), could not maintain work. (*PageID#* 90). The VE acknowledged that an individual who missed work two or more times a month would be unable to work. (*Id.*).

## III. Administrative Review

### A. "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§ 423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B. ALJ Bruning's Decision

ALJ Bruning resolved Plaintiff's disability claim by using the five-Step

14

sequential evaluation procedure required by Social Security Regulations. *See PageID##*
54-55; *see also* 20 C.F.R. § 404.1520(a)(4). Her pertinent findings began at Step 2 of the
sequential evaluation where she concluded that Plaintiff had the following severe
impairments: atheroslcerotic heart disease; degenerative changes to the lumbar spine;
obesity; cervical strain; borderline intellectual functioning; and depression/anxiety.
(*PageID#* 55).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or
combination of impairments that met or equaled the criteria in the Commissioner's
Listing of Impairments. (*PageID#* 56).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional
capacity (RFC) to perform sedentary work, but with the following restrictions: no
climbing of ladders, ropes or scaffolds; only occasional balancing, stooping, crouching,
kneeling, crawling, and climbing of ramps and stairs; avoiding concentrated exposure to
work hazards and lung irritants; with a sit/stand option allowing the person to stand for 5
minutes after 1 hour. (*PageID#* 58). Plaintiff's non-exertional limitation included work
involving simple repetitive work with repetitive 3 step tasks. (*Id.*).

The ALJ concluded at Step 4 that Plaintiff is unable to perform his past relevant
work. (*PageID#* 59). At Step 5, the ALJ concluded that Plaintiff could perform a
significant number of jobs in the national economy. (*PageID##* 60-61).

The ALJ's findings throughout her sequential evaluation led her to ultimately
conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or

SSI.  (*PageID#* 61).

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

16

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.   Discussion

### A.   The Plaintiff's Contentions

Plaintiff assigns three errors in this case.  First, Plaintiff contends that the ALJ erred in her evaluation of treating physician, Dr. Cullis' opinions.  (Doc. #11 at *PageID#* 911).  According to Plaintiff, the ALJ failed to cite to any affirmative medical evidence that supports her conclusion that Plaintiff could perform a reduced range of sedentary work.  (*Id.* at *PageID#* 914).  Second, Plaintiff asserts that the ALJ failed to properly evaluate Plaintiff's credibility.  (*Id.* at *PageID#* 915).  Finally, Plaintiff argues that the ALJ relied upon flawed VE testimony.  (*Id.* at *PageID#* 918).

### B.   Medical Source Opinions

### 1.

### Treating Medical Sources

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ.  *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004).  A treating physician's opinion

is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record.  (*Id.*).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources.  *See* 20 C.F.R. § 404.1527(c)(1)[4].  Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.927(c), (e); *see also* Ruling 96-6p at *2-*3.

---

[4]20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at 20 C.F.R. §§ 404.1527(d) and 416.927(d).

**2.**

**Non-Treating Medical Sources**

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id.* at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.1527(e); *see also* Ruling 96-6p at *2-*3.

**C.**    **Analysis**

**1.**    **Dr. Cullis' opinions**

According to Plaintiff, the ALJ erroneously discredited his treating physician, Dr. Cullis' opinions that Plaintiff is unable to work, and thus violated the treating physician rule.

After considering the record evidence as a whole, the ALJ reasonably concluded that Plaintiff was capable of performing a range of sedentary work activities consistent with Dr. Cullis' August 8, 2007 opinion.  (*PageID#* 59).  The ALJ gave "little weight" to

Dr. Cullis' June 12, 2009 opinion based on her finding that Dr. Cullis expressed an opinion as to Plaintiff's psychological impairments – an area outside his expertise – based on self reports from Plaintiff, and with no citation of clinical findings that are different from the opinion of May 3, 2007. (*Id.*).

Plaintiff asserts that, contrary to the ALJ's findings, Dr. Cullis' June 12, 2009 opinion was not based entirely on Plaintiff's subjective statements. *See* Doc. #11 at *PageID#* 912-13. Plaintiff argues that the treating cardiologist specifically stated that his findings were based on clinical and objective evidence, and his opinions were uncontradicted by any other substantial evidence in the record. (*Id.*). According to Plaintiff, the ALJ rejected the only other medical opinions in the record (from the non-examining State agency reviewing physicians) and did not indicate that she gave weight to any other evidence. (*Id.*).

The ALJ did not err by concluding that Dr. Cullis' June 12, 2009 opinion was not entitled to controlling weight because it was not adequately supported, and because it was inconsistent with other reliable evidence in the record. The ALJ also explained that Dr. Cullis' June 12, 2009 opinion was entitled to little weight, in part, because he was a cardiologist, and not certified in the area of mental health. (*PageID#* 50). Plaintiff argues that the ALJ failed to follow the regulations in evaluating Dr. Cullis' June 12, 2009 opinion. Plaintiff notes that even if the ALJ was not required to grant controlling weight to Dr. Cullis' opinions, she still failed to weigh his opinions under the required factors of specialization; the nature and extent of the treatment relationship; supportability of the

20

opinion; and consistency of the opinion with the record.  *See* 20 C.F.R. §§ 404.1527(c).
*See* Doc.# 11 at *PageID#* 913.  The ALJ's consideration of the specialization factor is
consistent with the Regulations, 20 C.F.R. § 404.1527(c)(5), and is supported by
substantial evidence record.

A review of the ALJ's decision reveals additional reasons why she rejected Dr.
Cullis' opinion.  For example, Dr. Cullis did not conduct a mental status evaluation or
perform any psychiatric tests in forming his opinion.  Rather, he based his opinion on
Plaintiff's subjective complaints and allegations.  Neither a treating physician's diagnosis
nor his or her statement that a claimant is disabled is determinative of the ultimate
disability determination under the Social Security Act.  *See Landsaw v. Sec'y of Health &
Human Servs.,* 803 F.2d 211, 213 (6th Cir. 1986); *see also* 20 C.F.R. § 404.1527(d)(1).

The ALJ also explained that Dr. Cullis did not provide a supporting rationale for
why his June 12, 2009 opinion is different from his opinion of May 3, 2007 (including
regarding left ventricular ejection fraction of 33-35%).  (*PageID#* 59).  This constituted
an additional correct basis under the Regulations for discounting Dr. Cullis' June 2009
opinion.  *See* 20 C.F.R. § 404.1527(c)(3)-(4).  Moreover, a review of Dr. Cullis' June 12,
2009 opinion, and his treatment records since August 2007, reveals only a few brief notes
(without significant analysis) to support his conclusion that Plaintiff was unable to work
in a sedentary position.  (*See PageID##* 748-50, 797-99, 832-37, 863-64).

The ALJ based her RFC determination on Dr. Cullis' August 2007 opinion.  The ALJ found that Dr. Cullis' August 2007 opinion was well supported by clinical observations and objective medical evidence.  (*PageID#* 59).

The ALJ applied the correct legal criteria to Dr. Cullis' opinions.  Substantial evidence supports her reasons for discounting Dr. Cullis' June 2009 opinion, and instead relying on his August 2007 opinion.

In addition, while Plaintiff attached the Administration's Notice of Fully Favorable Decision, dated April 4, 2012 (granting Plaintiff SSI benefits since April 27, 2010), the ALJ in that case noted that "the ultimate basis for a finding of 'disability,' is the claimant's mental impairment."  *See* Doc. #11-1 at *PageID##* 922-28, 926.  A review of this Notice also indicates the ALJ considered additional mental health records not set forth in the present case.

### 2.    Plaintiff's Credibility

Plaintiff also challenges the ALJ's credibility determination as unsupported by any evidence of record.

"'There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003)) (other citation omitted).  Yet, "'an ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability.'" *Cruse*, 502 F.3d at

542 (quoting *Jones*, 336 F.3d at 476)(other citation omitted).  "Notably, an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse*, 502 F.3d at 542 (citations omitted).  An ALJ's credibility determinations must be supported by substantial evidence.  (*Id.*).

Contrary to Plaintiff's contentions, substantial evidence supports the ALJ's credibility determination.  The ALJ reasonably found that certain factors undermined Plaintiff's credibility.  (*PageID##* 56-59).  The ALJ correctly recognized that Plaintiff noted that he was able to perform activities of daily living (*see PageID##* 245-52, 266-73), but at the hearing, Plaintiff testified that he does not perform activities of daily living because others do them for him.  (*PageID#* 59).  The ALJ also correctly noted that Plaintiff complained that he is unable to do any work, but stated he can attend ball games once a week in the summer, can go out to eat, handles his own finances, reads, cares for dogs, does word puzzles, and watches television. (*PageID##* 245-252, 270).  The above activities undermine Plaintiff's subjective complaints of disability and provide substantial evidence to support the ALJ's credibility determination.

Accordingly, the ALJ did not err in considering Plaintiff's credibility.

### 3.    Vocational Expert Testimony

Plaintiff next argues that the ALJ erred by relying on the VE's testimony because it was in response to an improper hypothetical question.  Plaintiff's position is that the VE testified that an individual who is off task more than 10 to 12 percent of the workday

23

could not maintain unskilled work, (*PageID#* 89), and that an individual who needs

unscheduled breaks beyond the customary breaks allowed in the morning and afternoon

(and for lunch), could not maintain work.  (*PageID#* 90).  Both of these limitations,

however, are based on findings from Dr. Cullis' July 12, 2009 opinion, for which the ALJ

assigned little weight.  *See PageID#* 59.

A hypothetical question must accurately portray the claimant's physical and

mental impairments.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th

Cir. 1987).  If a hypothetical question has support in the record, it need not reflect the

claimant's unsubstantiated complaints.  *Blacha v. Sec'y of Health & Human Servs.*, 927

F.2d 228, 231 (6th Cir. 1990); *see also Stanley v. Sec'y of Health & Human Servs.*, 39

F.3d 115, 118 (6th Cir. 1994).  A hypothetical question need only include those

limitations accepted as credible by the ALJ.  *Casey v. Sec'y of Health & Human Servs.*,

987 F.2d 1230, 1235 (6th Cir. 1993).  A VE's response to a hypothetical question that

accurately portrays an individual's impairments constitutes substantial evidence for

determining whether a disability exists.  *Varley*, 820 F.2d at 779-80.

The VE testified regarding jobs that Plaintiff could perform given the hypothetical

presented by the ALJ, such as information clerk, charge account clerk, and order clerk.

(*PageID##* 87-88).  The ALJ adopted the VE's testimony in response to a hypothetical

question that described an individual with the limitations found by the ALJ (consistent

with his own testimony and the medical source opinions the ALJ rejected), which

accurately reflected all the limitations the ALJ found credible.  *See Gooch v. Sec'y. of*

*Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) ("[W]e will not normally substitute our impressions on the veracity of a witness for those of the trier of fact.").  The ALJ reasonably relied on the VE's testimony in finding that Plaintiff was not disabled. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994) ("the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals") (citation omitted)).

This contention lacks merit because Plaintiff has not shown that the ALJ's assessment of his RFC was based on legal error or unsupported by substantial evidence. As a result, the VE's testimony addressing a hypothetical person with these limitations and abilities – which incorporated the ALJ's RFC – constituted substantial evidence to support the ALJ's conclusion at step 5 of the sequential analysis.  *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (citing Varley, 820 F.2d at 779) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert....")).

Accordingly, for all the above reasons, Plaintiff's Statement of Errors lacks merit.

### IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's final non-disability determination be affirmed; and

2.      The case be terminated on the docket of this Court.


June 25, 2013                                    _____s/ Sharon L. Ovington_____
                                                              Sharon L. Ovington
                                                  Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).